GREGORY, Circuit Judge,
concurring in part and dissenting in part:
While I agree with the majority that SORNA is not unconstitutionally vague as applied to Bruffy,* I would hold that the government has not met its burden of proof in this case, and I would vacate Bruffy’s conviction.
I.
SORNA states that whoever “knowingly fails to ... update a registration as required by” SORNA is subject to prosecution. 18 U.S.C. § 2250(a)(3). SORNA requires that an offender update his registration in those jurisdictions “where the offender resides, where the offender is an employee, and where the offender is a student.” 42 U.S.C. § 16913(c). No contention is made that the latter two categories are at issue. Unlike the majority, however, I would hold that Bruffy did not “reside” in Virginia for purposes of SOR-NA as a matter of law.
The disagreement boils down to an interpretation of “resides,” which the statute defines as “the location of the individual’s home or other place where the individual habitually lives.” Id. § 16911(13). Although Bruffy was certainly living in the northern Virginia, D.C. metropolitan, and southern Maryland region for the disputed time period, Bruffy did not “habitually live” in any one of these areas. His duty to update his SORNA registration was *247 therefore never triggered, and there cannot be sufficient evidence to convict him of a SORNA violation.
There is no suggestion that Bruffy did not comply with the updating provision when he left Florida. Because he was no longer going to habitually live in Florida, he was required to notify the jurisdiction he was leaving within three business days. 42 U.S.C. § 16913(c). Bruffy complied with that requirement by noting that he would be transient in the Edgewater, Maryland region, which is where he intended to move. But because he did not have a permanent address — a new place where he would habitually live — Bruffy wrote that he would be “transient.” The majority doesn’t say that he violated SORNA when he left Florida; instead, the violation supposedly came after he had spent some nights in Alexandria.
Furthermore, even though Bruffy had no residence, according to the majority he was supposed to appear in person at a jurisdiction involved and update his registration. The statute tells us that even “jurisdiction” is defined with reference to “where the offender resides, where the offender is an employee, and where the offender is a student.” Id. § 16913(a), (c). Again, under the statute we cannot even say that Bruffy could have reported to a Virginia jurisdiction without first establishing that Bruffy in fact habitually lived in Virginia.
Even though I would find that the definition of “habitually lives” is not so vague as to be unconstitutional, the definition is not pellucid. The Department of Justice (“DOJ”) has issued guidelines to assist jurisdictions in understanding and implementing SORNA. The guidelines define “habitually lives” as “any place in which the sex offender lives for at least 30 days.” National Guidelines for Sex Offender Registration and Notification, 73 Fed.Reg. 38,-030, 38,062 (July 2, 2008). The guidelines admit that “[djefining changes in such matters as residence and employment may present special difficulties in relation to sex offenders who lack fixed residence or employment.” Id. at 38,065. The guidelines also state that jurisdictions are not required to treat as a change in residence every time that a sex offender sleeps on a different park bench, and the guidelines specify that a transient offender can comply with the statute by providing a description of the area in which she habitually lives. Id. at 38,030, 38,055, 38,065. While we are not bound by the DOJ guidelines, I would find their 30-day benchmark persuasive given that the meaning of “habitually lives” is ambiguous and subject to interpretation. See Christensen v. Harris Cnty., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (deferring to agency guidelines inasmuch as they are persuasive).
Whatever “habitually lives” may mean, it is clear to me that from February 5, 2009, to February 15, 2009, when Bruffy lived in his car, he had no fixed address, and he did not habitually live anywhere. According to the jointly stipulated facts, in that time period, Bruffy “slept and lived in his car at various locations in Northern Virginia (Belle Haven region), Washington D.C., and Maryland.” J.A. 100. Likewise, from January 13, 2009, to February 5, 2009, while Bruffy spent “almost every night” at the apartment, there were nonetheless “approximately a few” nights where he did not; he “stayed for approximately a few days at his uncle’s residence in Waldorf, Charles County, Maryland.” J.A. 100. Bruffys 23-day, non-continuous, stay at the Belle Haven apartment does not meet the 30-day standard recounted in the DOJ guidelines.
Under the DOJ guidelines, the 30-day benchmark for “habitually lives” “does not *248 mean that the registration of a sex offender who enters a jurisdiction to reside may be delayed until after he has lived in the jurisdiction for 30 days.” National Guidelines for Sex Offender Registration and Notification, 73 Fed.Reg. at 38,062. In other words, a 30-day stay is sufficient, but not necessary to constitute “habitually living.” Earlier registration is required when “a sex offender ... enters a jurisdiction in order to make his home or habitually live in the jurisdiction.” Id. (emphasis added). Importantly, the government does not contend that Bruffy intended to live at the Belle Haven apartment. When Bruffy left the Belle Haven apartment, he took all of his possessions with him. There was no address to which he had a legal right to return. And all the while, the stipulated facts show that “with respect to the defendant’s future plans, [Bruffy’s roommate] felt that everything revolved around Maryland. Defendant tried to find work with someone he used to work for in Maryland, and spoke generally about living in Maryland and Pennsylvania, where his son and sister lived.” J.A. 100. Bruffy did not intend to return to Belle Haven. Whether under the DOJ guidelines’ 30-day theory or its intent-based theory, Bruffy cannot be convicted of the instant SORNA offense.
II.
Even if I were to conclude that the DOJ regulations are not persuasive, I would find that under the plain language of the statute, Bruffy could not be convicted for the instant SORNA violation. First, as already noted, the 23-day period, even if considered to be unbroken by Bruffy’s stay in Maryland, does not rise to the 30-day period suggested by the DOJ guidelines to constitute “habitually lives,” and so it provides some evidence that Bruffy, under a plain-meaning theory, did not “habitually live[ ]” in Alexandria, Virginia. See id. at 38,062. Second, as discussed above, Bruffy did not intend to return to the Belle Haven apartment. A lack of intent to return to a location tends to show one does not habitually live in that location. Third, the circumstances surrounding his stay in the apartment likewise demonstrate that he did not habitually live there as a matter of law.
For most people, breaks in sleeping arrangements — like Bruffy’s stay at his uncle’s residence — would be unremarkable. But the backdrop for Bruffy is a situation of instability. The undisputed facts show that Bruffy spent most of the nights in that date range at the Belle Haven apartment, where he would shower, eat his meals (which he paid for and prepared), and carry his belongings (including a blanket and a pillow) to and from his car daily. He didn’t have a key to the apartment; he didn’t receive calls there; and he informed the residents of his return to the apartment each day so that they could let him into the apartment. Bruffy obtained advance permission to stay at the Alexandria apartment, although it was understood that this was “a week-by-week situation” because Bruffy intended to rent his own residence in Maryland as soon as he got a job.
The key to the plain-language analysis is the word “habitually.” There is nothing habitual about Bruffy’s living situation. It is true that one of the occupants believed Bruffy could stay “a couple of weeks until [he] became situated.” Id. While a stay of a couple of weeks might rise to the level of “resides” and “habitually lives,” under the plain meaning definition (though likely not under DOJ’s guidelines), this was clearly not such a case. Bruffy had called in advance to determine whether he could stay at the apartment, but no time frame was discussed for how long he could stay. *249 It appears that he knew he could be refused entry at the Alexandria apartment any day. Bruffy knew that his stay was not contingent solely on whether he could find a job and an apartment of his own, but also upon the daily consent of the Alexandria apartment tenants. A situation so unstable cannot be termed habitual.
III.
As the majority notes, the federal case that comes the closest to the present facts is United States v. Voice, 622 F.3d 870, 873 (8th Cir.2010), in which a sex offender registered at a halfway house in Sioux Falls, South Dakota, left Sioux Falls, and relocated to Fort Thompson, South Dakota. While the court refused to address “whether some travelers are so transient that a jury could not reasonably find a change of residence during extended travels,” the court found that the evidence presented to the jury was sufficient to convict Voice. Id. at 874.
While the facts of Voice are similar to the present case, they are distinguishable. After moving to Fort Thompson, Voice first stayed for ten days at a friend’s house, where he would receive mail, eat dinner, and shower; Voice then slept on a cement slab near an abandoned comfort station in Fort Thompson, where he kept his belongings. Id. at 873-74. Voice habitually lived in the Fort Thompson area for two months — well beyond the 30-day DOJ guidelines — without updating his registration to show that he had left the Sioux Falls area. Most importantly, Bruffy updated his registration to note he would be transient when he left Florida. Furthermore, Bruffy spent some nights in Alexandria but other nights in Maryland over a 23-day period, then he spent a few nights in his car in the metropolitan D.C. area. Another telling indicator is that Voice kept his possessions in the comfort station — a fixed location to which he returned nightly to sleep — whereas Bruffy kept his in his car.
More on point are a number of state court cases that have found insufficient evidence to convict transient sex offenders under state analogues to SORNA. In Jeandell v. State, 395 Md. 556, 910 A.2d 1141 (2006), the Maryland Court of Appeals rejected the lower court’s interpretation of “residence,” which the district court found to mean “living location.” Id. at 1144. The court found that the defendant, a homeless man, who was “staying wherever he could,” could not be convicted under the state’s sex-offender registration statute. Id. at 1144-15. Particularly relevant is Twine v. State, 395 Md. 539, 910 A.2d 1132 (2006), which also vacated a conviction of a homeless man, stating that “residence” only exists if the registrant “has a fixed location at which the registrant is living, and to which the registrant intends to return upon leaving it.” Id. at 1140; see also Santos v. State, 284 Ga. 514, 668 S.E.2d 676, 679 (2008) (sex offender registration statute unconstitutionally vague as applied to homeless offender because statute requires a street or route address). During the disputed dates, Bruffy was “staying wherever he could,” Jeandell, 910 A.2d at 1144-45, and he did not have a “fixed location at which he was living and to which he intended to return upon leaving it,” Twine, 910 A.2d at 1140.
IV.
The majority is correct about Bruffy’s actions in one respect. He certainly could have done more. He could have changed his registration to more accurately reflect the geographic area in which he spent the majority of the time. But even though his actions did not constitute best practices, Bruffy complied with SORNA because his duty to update his registration was never *250 triggered. What’s left is the conclusion that Bruffy’s only crime was being a homeless sex offender.
Whether analyzed under the DOJ guidelines or the plain-meaning of the statute, I would find that Bruffy did not habitually live in the Belle Haven region of Alexandria, Virginia, from January 13, 2009, until February 5, 2009, and therefore I would also find that his duty to update his registration under SORNA was never triggered. I respectfully dissent.

 Unlike the majority, I do not believe that we must find that Bruffy habitually lived in the Belle Haven region of Alexandria, Virginia, to find that the statute is not unconstitutionally vague as applied to Bruffy.
To be constitutional, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.” Skilling v. United States,—U.S.—, 130 S.Ct. 2896, 2927-28, 177 L.Ed.2d 619 (2010) (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983), alterations in Skilling); see also City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (finding a loitering ordinance unconstitutionally vague because it "fails to give the ordinary citizen adequate notice of what is forbidden and what is permitted”).
There are objective criteria that an ordinary person would understand to be indicators of whether she "habitually lives” in a particular location. Some indicators include whether that person is currently owning or renting a living space, where the defendant keeps her possessions, where she intends to return to each night, and so forth. That there is a disagreement here as to whether the government has met its burden in proving that Bruffy habitually lived in Belle Haven, Alexandria, Virginia, is beside the point. What's relevant is that there are easily understandable criteria that an ordinary person could utilize to assess her behavior under the statute.
Nor does the statute encourage arbitrary or discriminatory enforcement. The difference with Morales is informative. Morales held that a loitering statute was unconstitutional because police officers had to determine whether someone was standing on a street with no "apparent purpose” and such a term lacked objective indicia to guide enforcement. 527 U.S. at 56-59, 119 S.Ct. 1849. When determining whether someone "resides” at a particular location, again, a series of objective factors can be taken into consideration, as recounted above. The inquiry is certainly less subjective than determining the difference between a person’s residence and domicile — a longstanding distinction in our jurisprudence.