# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3260

_____

United States of America,       *
                                      *

       Plaintiff - Appellee,       *

                                      *    Appeal from the United States

       v.                               *    District Court for the

                                      *    District of South Dakota.

Harold Voice,                      *
                                      *

       Defendant - Appellant.       *

_____

Submitted: June 15, 2010
Filed: September 1, 2010

_____

Before LOKEN, ARNOLD and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

A jury convicted Harold Voice of violating 18 U.S.C. § 2250(a), part of the Sex Offender Registration and Notification Act of 2006 (SORNA), by failing to update his South Dakota sex offender registration. The district court[1] sentenced him to forty-six months in prison. Voice appeals his conviction, challenging the sufficiency of the evidence, the denial of his pre-trial motions to suppress and to dismiss the indictment, and other district court rulings. We affirm.

_____

[1]The HONORABLE KAREN E. SCHREIER, Chief Judge of the United States District Court for the District of South Dakota.

## I. Sufficiency of the Evidence and Related Issues

In 1998, Voice was convicted of abusive sexual contact with a minor in Indian country. He was released in November 2005 and placed on supervised release in Rapid City, South Dakota, where he registered as a sex offender as required by South Dakota law. See S.D. Codified Laws §§ 22-24B-1 *et seq*. Voice's offense was a "sex offense" under SORNA, first enacted in 2006, meaning that he is a "sex offender" who must "register, and keep the registration current, in each jurisdiction where the offender resides." 42 U.S.C. §§ 16911(1) and (5)(A)(iii), 16913(a). Failing to update a registration as required by SORNA is a violation of 18 U.S.C. § 2250(a) punishable by up to ten years imprisonment.

In April 2008, Voice was placed on supervised release at Glory House, a halfway house in Sioux Falls, South Dakota. United States Probation Officer Maureen Janssen informed Voice that he must register as a sex offender under federal law. He signed a form entitled "Notice and Acknowledgment of Duty to Register as a Sex Offender" informing him of his obligation to update his federal registration every three months and within three days of changing residence. He also completed a South Dakota sex offender registration form, which satisfied his initial SORNA registration obligation. See 42 U.S.C. §§ 16911(10)(A), 16913(a). He later completed a South Dakota registration update in July 2008.

On July 31, Voice assaulted another Glory House resident. Glory House terminated Voice's participation in its program. On August 1, a Glory House counselor notified Janssen of the incident, and she met with Voice to discuss it. Though neither Janssen nor the counselor informed Voice he was terminated from the Glory House program, he absconded from the halfway house that night. This was a supervised release violation, and a federal warrant issued for his arrest.

After leaving Glory House, Voice relocated to Fort Thompson, South Dakota, within the Crow Creek Sioux Indian Reservation. Scott Shields, Fort Thompson's Chief of Police, saw Voice walking a quarter mile from an abandoned tribal comfort station on October 2 and arrested him on the outstanding warrant. Voice told police his residence was Glory House in Sioux Falls. Chief Shields is responsible for registering sex offenders in the Fort Thompson area. After learning that Voice was on supervised release for a federal sex offense, and knowing he had not registered with the Fort Thompson police, Shields began investigating whether Voice had violated SORNA by failing to register in Fort Thompson.

On October 3, Chief Shields interviewed Priscilla St. John, who said that Voice regularly visited the trailer she shared with Ronnie Wounded Knee, eating dinner three times a week and using the shower once a week. After handing Shields a leather jacket Voice had left in the trailer, St. John took Shields to the abandoned comfort station across the street from Wounded Knee's trailer. She pointed out a cement slab outside the building where she said Voice had been sleeping and told Shields that Voice was keeping his possessions inside the abandoned building. Shields left briefly to interview Voice's cousin, Karen Voice, and then returned to the comfort station. He seized a camouflage jacket lying on the cement slab. Inside the refuse-filled station, Shields found two duffel bags, one marked "Darla V.," the other marked "Traversie." He looked inside the bag marked "Darla V." and found an envelope from the Interior Department addressed to Voice at Karen Voice's post office box address. Shields put the letter back in the "Darla V." bag and seized both bags without further inspection.

SORNA requires a registered sex offender to appear in person "not later than 3 business days after each change of name, residence, employment, or student status" to inform an involved jurisdiction of all changes needed to update his registration. 42 U.S.C. § 16913(a) & (c); see also S.D. Codified Laws §§ 22-24B-7 & -12. From August 1 to October 2, 2008, when he was arrested, Voice did not update his sex-

offender registration. The indictment charged that Voice "did knowingly fail to register and update a registration, in violation of 18 U.S.C. § 2250(a)." The government's theory was that Voice was under an obligation to update his registration because he changed his residence from Glory House to one or more locations in the Fort Thompson area.

At trial, Roger Head testified that Voice lived for approximately ten days in Head's home after arriving in the Fort Thompson area. Karen Voice testified that Voice visited her Fort Thompson home approximately six times and spent one night there. During one visit, she gave Voice a change of clothes and a duffel bag marked "Darla V." Karen also agreed to let Voice use her post office box address to receive mail and delivered mail to Voice at Wounded Knee's trailer, including a letter from the United States Department of the Interior Trust Program Management Center. Priscilla St. John's testimony was consistent with the above summary of what she told Chief Shields when he interviewed her on October 3, 2008.

The jury convicted Voice of violating 18 U.S.C. § 2250(a) during the time between August 5, 2008 and October 2, 2008. On appeal, Voice argues the evidence was insufficient in two respects. "We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government, resolving evidentiary conflicts in the government's favor, and drawing all reasonable inferences in favor of the jury's verdict." United States v. Stymiest, 581 F.3d 759, 764 (8th Cir. 2009), cert. denied, 130 S. Ct. 2364 (2010).

**A. Change of Residence.** (a) Voice argues the evidence was insufficient to prove a SORNA violation because it showed only that he left Glory House and traveled within South Dakota from August to October 2008, visiting friends and family, not a change of residence. We disagree. In setting forth the elements of a § 2250(a) offense, the jury instructions explained that the government must prove, beyond a reasonable doubt, that Harold Voice is a sex offender who must "register,

-4-

and keep his registration current, in each jurisdiction where the offender resides," and that, to update a registration, he must appear in person to inform the pertinent jurisdiction not later than three business days after a change of residence. Consistent with the statute, the instructions defined "resides" as meaning "the location of [an] individual's home or other place where the individual habitually lives." See 42 U.S.C. § 16911(13). Without objection, the instructions did not define "habitually lives." Thus, the issue as framed by these instructions is whether, during the time in question, Voice changed the place where he "habitually lived" requiring him to update his registration.

The evidence viewed in the light most favorable to the jury verdict showed that Voice absconded from Glory House on August 1, triggering an arrest warrant for violating conditions of his supervised release, and then lived in various places in the Fort Thompson area until his arrest on October 2. He spent ten days living at Roger Head's home -- a conventional dwelling with an address. He then lived for some period of time at the comfort station. We need not decide whether some travelers are so transient that a jury could not reasonably find a change of residence during extended travels. Here, there was sufficient evidence for a reasonable jury to find that Voice failed to register a change of residence when he "habitually lived" in one or more locations in the Fort Thompson area between August 5 and October 2, 2008. We reject the suggestion that a savvy sex offender can move to a different city and avoid having to update his SORNA registration by sleeping in a different shelter or other location every night.[2] As the Attorney General's SORNA Guidelines explained:

---

[2]United States v. Van Buren, 599 F.3d 170, 172-75 (2d Cir. 2010), affirmed a jury instruction that an updated registration is required if a sex offender leaves his registered residence with no intent to return. Though no such instruction was requested in this case, we agree with the Second Circuit's analysis of the statute's language and apparent intent.

Sex offenders who lack fixed abodes are nevertheless required to register in the jurisdictions in which they reside . . . . Such sex offenders cannot provide [a] residence address . . . because they have no definite "address" at which they live. Nevertheless, some more or less specific description should normally be obtainable concerning the place or places where such a sex offender habitually lives -- e.g., information about a certain part of a city that is the sex offender's habitual locale, a park or spot on the street (or a number of such places) where the sex offender stations himself during the day or sleeps at night [etc.].

National Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38,030, 38,055 (July 2, 2008).

(b) Voice further argues that the prosecutor was guilty of misconduct during closing when he said, "What's the definition of 'habitually'? Under the law it's three days." Voice objected and the district court properly instructed the jury to "rely on the jury instructions that I gave you for what the law means." The prosecutor then stated, consistent with the jury instructions, "The third element of the instruction say[s], '[t]o update a registration, a sex offender shall, not later than three business days after each change of name, residence, employment, or student status, appear in person in the appropriate jurisdiction and inform' them basically that you are there." Voice argues the court erred by "failing to sustain the objection and instruct the jury that the prosecutor had incorrectly described the law." This contention is without merit. District courts have "broad discretion in controlling closing arguments, and we overturn a conviction on the basis of prosecutorial misconduct only upon a showing that improper remarks, in light of any rulings or curative instructions by the district court and in light of the trial as a whole, could reasonably have affected the jury's verdict." United States v. Holmes, 413 F.3d 770, 774 (8th Cir. 2005). The court's ruling on the objection, referring the jury to the jury instructions, was sufficient to correct any misstatement of the governing law.

(c) Finally, Voice argues for the first time on appeal that there was a prejudicial variance in the proof because the grand jury charged one failure-to-register offense but the prosecutor argued in closing that Voice habitually lived at both Roger Head's home and the comfort station. This contention, too, is without merit. "The evidence presented at trial did not prove facts materially different from those alleged in the indictment, as required for us to find a variance." United States v. Wright, 540 F.3d 833, 841 (8th Cir. 2008) (quotation omitted), cert. denied, 129 S. Ct. 2377 (2009). Voice had adequate notice of the case to be presented against him and did not request a jury instruction on whether there was one or more separate offenses.

**B. Knowledge.** (a) Voice next argues there was insufficient evidence that he *knowingly* violated SORNA by failing to register because he was not informed that his stay in Fort Thompson would be considered a change of residence. However, 18 U.S.C. § 2250(a) does not require proof of specific intent to violate the law. United States v. Gould, 568 F.3d 459, 468 (4th Cir. 2009), cert. denied, 130 S. Ct. 1686 (2010). The term "knowingly" "merely requires proof of knowledge of the facts that constitute the offense." Bryan v. United States, 524 U.S. 184, 193 (1998). Consistent with this governing law, the district court correctly instructed the jury on the meaning of the term "knowingly" in SORNA:

> "Knowledge" is an element of the offense charged in this case and must be proved beyond a reasonable doubt. The prosecution is not required to prove that the defendant knew that his acts or omissions were unlawful. An act is done "knowingly" if the defendant is aware of the act and does not act through ignorance, mistake, or accident. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

Here, there was uncontroverted evidence that Voice knew of his obligation to register upon changing his residence but did not do so, and there was no evidence his failure

to do so was the result of "ignorance, mistake, or accident." The jury reasonably found a knowing violation. See Gould, 568 F.3d at 468.

(b) Voice further argues that the district court erred by refusing to give one part of his requested theory-of-defense instruction: "Voice asserts he is not guilty because . . . there is no evidence that [he] was aware of an obligation to register on the Crow Creek Reservation." But this instruction incorrectly implied that a "knowing" violation of § 2250(a) required proof that Voice knew his actions triggered an obligation to update his registration. See United States v. Griffey, 589 F.3d 1363, 1367 (11th Cir. 2009), cert. denied, 130 S. Ct. 3290 (2010). A defendant is not entitled to a theory-of-defense instruction that does not correctly state the law. United States v. Aldridge, 561 F.3d 759, 764 (8th Cir. 2009), cert. denied, 130 S. Ct. 1095 (2010). Accordingly, the district court did not abuse its discretion when it refused this request and correctly instructed the jury on the knowledge element of the offense

(c) Finally, Voice argues that his conviction violated due process because he did not know and was never informed that his conduct would constitute a change of residence under SORNA. The "general rule [is] that ignorance of the law or a mistake of law is no defense to criminal prosecution." Cheek v. United States, 498 U.S. 192, 199 (1991). Voice relies on Lambert v. California, which held that "actual knowledge of the duty to register or proof of the probability of such knowledge and subsequent failure to comply are necessary before a conviction" for the "wholly passive" conduct of failing to register "can stand." 355 U.S. 225, 229 (1957). Though failure to update a SORNA registration is arguably passive conduct, Voice's prior knowledge of his obligations to register under SORNA and South Dakota law satisfied any due process notice requirements. See United States v. May, 535 F.3d 912, 921 (8th Cir. 2008), cert. denied, 129 S. Ct. 2431 (2009); accord Griffey, 589 F.3d at 1367-68. The district court correctly denied Voice's motion to dismiss the indictment on this ground.

## II. Suppression Issues

Before trial, Voice moved to suppress "luggage and the items inside the luggage that were seized and searched" by Chief Shields on October 3, 2008. The district court denied the motion, adopting the government's argument that Voice did not have an objectively reasonable expectation of privacy in the bags he left in an abandoned comfort station on tribal property and concluding, in any event, that he abandoned the bags and any privacy interest in them. On appeal, Voice argues he had a reasonable expectation of privacy in the closed luggage, he did not abandon that privacy interest, and the warrantless search of these closed containers violated his Fourth Amendment rights. We review the district court's factual findings for clear error and the ultimate question of whether the Fourth Amendment was violated *de novo*. United States v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008).

A defendant has Fourth Amendment standing to suppress evidence obtained by a warrantless search of property only if he "manifested a subjective expectation of privacy in [the property] that society accepts as objectively reasonable." California v. Greenwood, 486 U.S. 35, 39 (1988). The Fourth Amendment protects the privacy interests of persons, not of places or things. Accordingly -

> What a person knowingly exposes to the public, even in his own home
> or office, is not a subject of Fourth Amendment protection. But what he
> seeks to preserve as private, even in an area accessible to the public, may
> be constitutionally protected.

Katz v. United States, 389 U.S. 347, 351-52 (1967) (citations omitted). It is well-settled that Fourth Amendment limitations on warrantless searches apply to luggage and other closed containers searched outside the home. See Bond v. United States, 529 U.S. 334, 336-37 (2000); United States v. Chadwick, 433 U.S. 1, 10-11 (1977).

In considering this issue, we find it critical that, both in the district court and on appeal, Voice argues only that Chief Shields violated the Fourth Amendment by opening and searching the closed luggage. Although the motion to suppress included the luggage itself, Voice does not argue that Chief Shields unconstitutionally seized the bags he found in the comfort station. This is not surprising. Shields was investigating whether Voice violated SORNA by not registering in Fort Thompson. The information provided by Priscilla St. John gave Shields probable cause to believe that the bags belonged to Voice and were evidence he had been living at the comfort station. Voice was in custody so, at a minimum, Shields could reasonably take the bags to the police station for safe-keeping and further inquiry. In any event, with the issue not raised, it is clear that only the contents of the bags are at issue. Thus, the bags as well as the two jackets seized by Shields were properly admitted at trial.

Voice argues that he may challenge the warrantless opening and search of his luggage because he had a reasonable expectation of privacy in the contents of the closed bags. The government replies that Voice had no reasonable expectation of privacy because he left the luggage unattended in an abandoned tribal comfort station accessible to anyone who chose to enter.[3] The potential sweep of the government's argument is troubling. If sound, it means that a person has no Fourth Amendment

_____

[3]The government also defends the district court's alternative ground, that Voice abandoned the luggage when he left it in a place that could be accessed by others. Any expectation of privacy in property "is forfeited upon its abandonment." United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997), cert. denied, 522 U.S. 1061 (1998). Whether property has been abandoned is a question of fact that turns primarily on whether the objective facts available to the investigating officers evidenced (i) the suspect's denial of ownership, and (ii) that he physically relinquished the property in a way that demonstrated abandonment. See United States v. James, 353 F.3d 606, 616 (8th Cir. 2003); United States v. Liu, 180 F.3d 957, 962 (8th Cir. 1999). Here, the government presented no evidence that Voice denied ownership of the luggage, or that he physically relinquished the property, as opposed to leaving it unattended. Indeed, the government's theory of the case was that the luggage was evidence of where Voice was living, not that he had abandoned it.

standing to suppress evidence seized by police officers while rummaging, without a warrant or even reasonable suspicion, through a closed container left unattended near a bunk in a homeless shelter, college dormitory, or military barracks; or on a bench or seat in an airplane terminal or bus station; or by a table at a restaurant while a patron used the restroom. The government cites no factually similar case supporting its argument, only cases that involved searches of closed containers found in vehicles, as in United States v. Ross, 456 U.S. 798, 801 (1982); or in open fields, as in United States v. Stallings, 28 F.3d 58, 60-61 (8th Cir. 1994); or in plain view from a common street or hallway, as in United States v. McGrane, 746 F.2d 632, 633 (8th Cir. 1984). The closest case we have found is State v. Mooney, 588 A.2d 145, 150 (Conn. 1991), where the homeless defendant left a duffel bag, a closed cardboard box, and other belongings unattended under a public bridge where he was living. Describing the issue as "close," the Court in a four-to-three decision held that the warrantless search of the closed containers violated the defendant's Fourth Amendment rights; the thorough majority and dissenting opinions helpfully explored competing arguments on both sides of the expectation-of-privacy issue.

We conclude that we need not decide this question because any error in admission of the evidence in question was harmless beyond a reasonable doubt. The disputed issue at trial was whether Voice was residing in the Fort Thompson area and therefore violated 18 U.S.C. § 2250(a) by failing to update his SORNA registration. The government introduced overwhelming evidence that, after absconding from Glory House in Sioux Falls, Voice spent many weeks in the Fort Thompson area living in different locations. Roger Head testified that Voice stayed in his home for ten days. Karen Voice testified that Voice visited her home six times beginning in August and stayed there at least one night. And Priscilla St. John testified that Voice regularly visited her trailer, had been sleeping outside the comfort station near where he was arrested, and had put personal belongings inside that building. The bags and jackets corroborated St. John's testimony and were independent evidence that Voice had been living at the comfort station.

-11-

The only contents of the luggage admitted at trial was the Department of Interior letter addressed to Voice at Karen Voice's post office box. To be sure, evidence that Voice had his mail sent to a Fort Thompson post office box was relevant to whether he was residing there. But Karen Voice testified that she had agreed to let Voice use her postal address and that she later retrieved mail from the box and delivered it to Voice at Wounded Knee's trailer. The letter added nothing to the government's case except to corroborate this testimony. We conclude the letter --- cumulative evidence that added little to the government's overwhelming proof that Voice resided in Fort Thompson -- was harmless beyond a reasonable doubt. Accord United States v. Tenerelli, --- F.3d ----, 2010 WL 2990932, at *3-4 (8th Cir. Aug. 2, 2010); United States v. Briley, 319 F.3d 360, 365 (8th Cir. 2003).

### III. An Evidentiary Issue

Voice argues that the district court erred by admitting as a business record the July 7, 2008, South Dakota sex-offender registration document he completed because the witness could not supply foundation required by Rule 803(6) of the Federal Rules of Evidence. The witness testified that she was the "keeper of [] records" for South Dakota's Division of Criminal Investigation; that her agency maintains South Dakota sex-offender registration forms in the normal course of its business; and that she recognized the document in question as a South Dakota sex-offender registration form signed by Voice, submitted by the Sioux Falls Police Department, and received by her office on July 9, 2008. This personal knowledge of the documents kept in the course of the agency's regular activity distinguishes this case from United States v. Riley, 236 F.3d 982, 984 (8th Cir. 2001), where a police officer lacked personal knowledge to lay the foundation for crime laboratory reports. A knowledgeable document custodian "need not have personal knowledge regarding the creation of the document offered, or personally participate in its creation, or even know who actually recorded the information." Brawner v. Allstate Indem. Co., 591 F.3d 984, 987 (8th Cir. 2010)

(quotation omitted). The district court did not abuse its discretion by admitting this document.

## IV. The Motion to Dismiss

In addition to the due process contention previously discussed, Voice's motion to dismiss the indictment argued that SORNA (1) does not apply to him because the Crow Creek Sioux Tribe has not implemented it, and (2) is unconstitutional as applied to him because it violates the Ex Post Facto Clause, the non-delegation doctrine, and exceeds Congress's power to regulate interstate commerce. On appeal, Voice acknowledges that we have recently decided these issues against him but argues the district court erred in denying his motion to dismiss on these grounds to preserve them for possible Supreme Court review. We agree these arguments are foreclosed by prior panel decisions.

Whether the Crow Creek Sioux Tribe has implemented SORNA is irrelevant because "SORNA applies to all sex offenders, regardless of whether the jurisdiction in which the sex offender resides has incorporated SORNA's requirements." United States v. Foster, 354 Fed. App'x 278, 281 (8th Cir. 2009), applying May, 535 F.3d at 921. Voice's prosecution did not violate the Ex Post Facto Clause because the failure to update his registration occurred after SORNA was enacted. Id. at 920. He lacks standing to argue that 42 U.S.C. § 16913(d) violates the non-delegation doctrine because he registered as a sex offender under South Dakota law before SORNA was enacted. United States v. Hacker, 565 F.3d 522, 527-28 (8th Cir.), cert. denied, 130 S. Ct. 302 (2009). His Commerce Clause contention is foreclosed by May, 535 F.3d at 921-22, and by United States v. Howell, 552 F.3d 709, 713-17 (8th Cir.), cert. denied, 129 S. Ct. 2812 (2009), because Voice's knowing failure to register upon

entering "Indian country," 18 U.S.C. § 2250(a)(2)(B), provides any link to commerce that may be needed for the registration obligations of 42 U.S.C. § 16913.[4]

The judgment of the district court is affirmed.

_____

[4]We have not yet been presented with the question whether a wholly intrastate change of residence triggering an offense under 18 U.S.C. § 2250(a)(2)(A) has a sufficient relationship to interstate commerce. As the issue was not argued or raised by the facts of this case, we decline to consider it.